UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

**RYAN DAVIS,**

**Plaintiff,**

**v.** **Case No. 25-C-499**

**PATRICK MURPHY et al.,**

**Defendants.**

---

## DECISION AND ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

---

Plaintiff Ryan Davis is a prisoner who is representing himself in this 42 U.S.C. §1983 action. He is proceeding on Eighth Amendment claims based on allegations that Defendants showed deliberate indifference to his ankle injury. On March 10, 2026, Defendant Dr. Karl Henrikson filed a motion for summary judgment. Dkt. No. 67. A few days later, on March 13, 2026, Defendants Dr. Patrick Murphy and Kelly Pelky filed their own motion for summary judgment. Dkt. No. 71. For the reasons explained below, the Court will grant the motions and dismiss this case.

## BACKGROUND

At the relevant time, Davis was housed at Oshkosh Correctional Institution, where Dr. Murphy worked as a physician and Pelky worked as the health services manager. Dr. Henrikson is an orthopedic surgeon and a co-owner of Orthopedic & Sports Medicine Specialists, a privately owned and operated medical facility that provides orthopedic care to patients on an individual basis. Dkt. No. 90 at ¶¶5-7; Dkt. No. 94 at ¶1.

On October 17, 2023, Davis injured his ankle playing basketball. He was seen by non-Defendant nurse Carie Van Cuyk, who noted that his ankle was swollen. She wrapped the ankle and told Davis to keep it elevated. She also issued Tylenol, Motrin, ice, crutches, an extra pillow, a wheelchair for distance, a tray assistant for meals, and low-bunk/low-tier restrictions. Davis was seen again the next day by non-Defendant nurse Cassandra Ledioyt, who noted that the ankle was significantly swollen and that Davis could not bear weight on it or move it. Ledioyt discussed Davis' condition with APNP Wendy Mohr, who splinted the ankle and ordered an x-ray. Dkt. No. 94 at ¶¶14-18.

On October 19, 2023, two days after he injured his ankle, Davis received an x-ray which showed no fracture or dislocation. The next day, Cuyk informed Davis the x-ray was negative and he should continue to treat his ankle with rest, ice, compression, elevation, and over-the-counter pain medication. Davis was seen for physical therapy on October 23, 2026. Four days later, on October 27, 2026, Dr. Murphy examined Davis and noted that Davis' Achilles was not torn, the ligaments appeared to be intact, and the tenderness was on the outer bone of his ankle, consistent with a sprain. Based on the x-ray result, Davis' reported symptoms, and the examination, Dr. Murphy diagnosed a typical ankle sprain. He ordered four more weeks of crutches and a wheelchair for distance. He also advised Davis to continue trying range of motion exercises. A follow-up visit was scheduled for four weeks out. Dkt. No. 94 at ¶¶19-26.

Dr. Murphy explains that severe ankle sprains generally take two to three months to build functional stability and three to six months for full functional recovery without pain. He also states that it is the standard of care for physicians to wait and see how an injury heels before deciding on what additional care a patient may require. There is no way to know how or on what timetable an injury will heal. Dkt. No. 94 at ¶¶27-28.

Three days after being examined by Dr. Murphy, Davis was seen again for physical therapy. The physical therapist noted that swelling had gone down significantly, which was a positive sign that there was no fracture. Davis disputes that the swelling had measurably decreased, noting that it simply *appeared* to have decreased because it was splinted and wrapped. Despite the physical therapist's belief that swelling had decreased, he was troubled by Davis' inability to bear weight on his ankle. He therefore instructed Davis to follow up with his provider to reassess his plan of care. He also noted that Davis should pause physical therapy, stating the provider could re-order it, if needed. Dkt. No. 94 at ¶¶28-30.

About two weeks later, on November 17, 2023, Dr. Murphy evaluated Davis' ankle. Davis was still using crutches and a wheelchair. He could bear some weight while using crutches but could not bear full weight or push off the ankle. Dr. Murphy noted some mild swelling and tenderness on his outer ankle and observed that the ligaments seemed stable, suggesting that the structural integrity of his ankle joint was intact. He determined that Davis' injury was turning into a chronic ankle sprain. Because movement is helpful for healing a soft tissue injury, Dr. Murphy advised Davis to return to physical therapy and to continue working on his range of motion and weightbearing, even if there was pain. Dkt. No. 94 at ¶¶31-35.

A few weeks later, on December 5, 2023, the health services unit was notified by an officer on Davis' unit that he was walking on the unit "just fine" without using crutches. The officer completed a functional observation of Davis and noted that he was able to walk around without crutches and was not using a wheelchair. Dr. Murphy examined Davis about a week later, on December 15, 2023, at which time Davis stated that he could walk short distances with pain and still needed a wheelchair for long distances. Dr. Murphy asserts that the reported symptoms were consistent with an ankle sprain as walking without pain after a severe sprain can take up to six

months. Davis believed his injury was more than a sprain. Although not reflected in his medical records, Davis asserts that he requested an MRI. It is undisputed that Dr. Murphy again informed Davis that the x-ray had been negative for a fracture. Dr. Murphy ordered physical therapy and encouraged Davis to walk as much as possible to improve strength. Dkt. No. 94 at ¶¶36-41; Dkt. No. 105 at ¶31.

Davis was seen by a physical therapist within a week, on December 20, 2023, and then again on December 27 and 29. The physical therapist noted deficiencies in Davis' range of motion and strength but also that Davis appeared not to be giving maximum effort and had poor awareness of exercises that he had been previously given. Davis points out that he was never given a printout with the exercises, so he forgot what he was supposed to do. The physical therapist advised Davis to stop using his wheelchair and assistive devices indoors. Davis told the physical therapist that he thought he needed more imaging like an MRI or another x-ray because he did not agree with Dr. Murphy that his ankle was only sprained. On January 3, 2024, the physical therapist noted that Davis' range of motion was within normal limits, but his ankle was still weak. The physical therapist tried to progress Davis to weight-bearing and other exercises, but Davis refused because of excruciating pain. Davis stated that he wanted to first see a provider to ask about further testing. Dkt. No. 94 at ¶¶42-47; Dkt. No. 105 at ¶33.

About a month later, on February 5, 2024 (about four months after the injury), Dr. Murphy examined Davis, at which time Davis reported his ankle was getting worse. He explained that he was walking without assistive devices, but he was in constant, severe pain. Davis requested an MRI, and although Dr. Murphy still suspected the ankle was sprained, he ordered an MRI and an orthopedic follow-up after the MRI. Dr. Murphy explains that it is the standard of care to wait six months after the initial injury to order further testing, as six months is about how long it takes most

chronic ankle sprains to get better. Once a provider places an order, he has no control over when the patient is seen. Providers are not responsible for scheduling onsite or offsite appointments for prisoners. Dr. Murphy explains that when a patient's injury is not urgent or life-threatening, it is standard for the patient to have to wait six to seven months to receive an MRI. Davis asserts that, regardless of when Dr. Murphy ordered the MRI, the scheduler did not schedule it until June 14, 2024. Dkt. No. 94 at ¶¶48-52; Dkt. No. 74-1 at 26; Dkt. No. 105 at ¶44.

On April 17, 2024, Davis was seen by the physical therapist, at which time he reported no pain at rest or with light walking. He stated that his ankle was stiff in the morning and hurt during prolonged walking, jogging, and basketball, which he tried only once. Davis also stated that he worked as a runner on the weekends for six to seven hours and did not feel pain. He also reported feeling no pain during the physical therapy appointment. Finally, the physical therapist noted that Davis' active range of motion and strength were within normal limits. Accordingly, the physical therapist discharged Davis from physical therapy and encouraged him to continue with his home exercise program. Dkt. No. 94 at ¶¶53-55.

Davis received an MRI on September 4, 2024, about seven months after Dr. Murphy ordered the MRI and about three months after the scheduler scheduled it. The MRI showed that Davis had an ununited lateral process facture with extensive degenerative changes in the subtalar joint. A talar process fracture is a fracture of one of the bones that connects the lower leg to the foot. The fracture was ununited, meaning the bone was unhealed. Dr. Murphy explains that injuries of this sort are rare and often missed on x-rays because the bone is small and difficult to see on an x-ray. They are also difficult to diagnose because the symptoms mimic those of a severe ankle sprain. The day after the MRI, Dr. Murphy met with Davis and explained the results. He

also advised Davis that he had an orthopedic consultation soon and increased Davis' acetaminophen order to extra strength. Dkt. No. 94 at ¶¶56-62.

Less than a week later, on September 10, 2024, Davis was seen at the Orthopedic & Sports Medicine Specialists clinic for an initial consultation. The doctor recommended that Davis return to a non-weight bearing boot. He also referred him to his colleague Dr. Henrikson for further evaluation and treatment. Dr. Henrikson first examined Davis about a month later, on October 17, 2024. Davis reported that his pain was manageable when he was not bearing weight but intensified to a level 4 when he was active. He stated that he was using Tylenol, naproxen, and topical creams for pain relief. Dr. Henrikson discussed both operative and nonoperative options to treat the ankle. Davis elected to proceed with surgery. Dr. Henrikson asserts that he told Davis the surgery could potentially be done within six weeks, which Davis understood to mean that the surgery *should* be done within six weeks. The Department of Corrections provided Dr. Henrikson with a form which Dr. Henrikson filled out with his written recommendation. The form also included several boxes regarding the urgency of the recommendation, but Dr. Henrikson asserts that no one informed him how to fill out the form or instructed him to check one of the boxes. Health services staff generally does not follow up with a provider if the boxes are unchecked because medical schedulers at offsite facilities are typically able to determine whether a case requires immediate attention or can be scheduled for a later date. On October 18, 2026, Dr. Murphy requested that the surgery be scheduled, and on November 27, 2024, a scheduler set the surgery for April 25, 2025, at St. Elizabeth Hospital. Dr. Henrikson explains that the surgery was scheduled based on his availability and the availability of his clinic staff, hospital staff, and the operating room. Dkt. No. 90 at ¶¶19-28; Dkt. No. 94 at ¶¶63-71; Dkt. No. 101; Dkt. No. 105 at ¶¶51-57; Dkt. No. 113 at ¶¶5-6.

On December 3, 2024, Dr. Murphy saw Davis in response to a health services request. Davis was upset that he was still waiting for the surgery. He believed that he had been told the surgery would be scheduled within six weeks. Davis also complained that his wheelchair did not have padding and that his hands were being cut up by the frame. Dr. Murphy issued wheelchair gloves and a cushion for his wheelchair. He also explained that the institution does not have control over the surgery date as surgeries are scheduled when the surgeon has availability. After the appointment, Dr. Murphy followed up with the scheduler who confirmed that she had asked for an earlier date, but a nurse at the clinic explained that this particular surgery would be very time-consuming, so they were unable to fit the patient in at an earlier time. Dkt. No. 94 at ¶¶72-75; Dkt. No. 74 at ¶100.

On December 5, 2024, Davis wrote to Pelky and told her that the clinic had said he was supposed to have surgery within six weeks. Pelky reviewed Davis' records and concluded he was not being ignored. Pelky explains that her position is mostly administrative in nature and that she does not generally evaluate, diagnose, or determine a course of treatment for patients. She also explains that she supervises nursing staff, not doctors or other advanced care providers who work under the supervision of the medical director. Pelkey responded to Davis on December 15, 2024, and told him that he was scheduled to see his provider and confirmed that he was scheduled for surgery. She also informed him he was on the waitlist for physical therapy. Davis wrote several additional health services requests addressed to Pelky, but they were triaged and responded to by health services staff. Dkt. No. 94 at ¶¶4-6; 87-91.

Dr. Murphy met with Davis on December 23, 2024. Davis was frustrated about the delay, and Dr. Murphy explained that the clinic had been contacted and had confirmed he was scheduled for the earliest available date. Davis was also upset that his right calf muscle was atrophying. Dr.

Murphy explained that the atrophy was expected because he was not weightbearing on that leg. He informed Davis that the atrophy would not be permanent and that he could rebuild the muscle once he was able to exercise. Dr. Murphy explains that the clinic never indicated that the surgery was urgent, and he did not believe the surgery was urgent. Dr. Henrikson confirms that Davis' injury was chronic, not acute, and did not require immediate or emergent surgical intervention. Dkt. No. 94 at ¶¶76-82; Dkt. No. 90 at ¶¶34-35.

In late January, Davis complained that the prescribed pain medication was not addressing his pain. Dr. Murphy had previously ordered acetaminophen and that order was filled on January 26, 2025. On January 30, 2025, Dr. Murphy also added salsalate for Davis' pain. Dr. Murphy saw Davis again on March 26, 2025. Davis reported his pain was 3/10 during the day with his boot on, but 8/10 at night with the boot off. He stated that the salsalate was not helping and his wheelchair gloves were missing. Dr. Murphy ordered tramadol for Davis' nighttime pain and new gloves. He encouraged Davis to continue to be patient as he waited for surgery. Dkt. No. 94 at ¶¶83-86.

On April 4, 2025, just a few weeks before the surgery was scheduled, Davis filed this lawsuit. Dr. Henrikson learned about the lawsuit on April 19, 2025. Two days later, on April 21, 2025, Dr. Henrikson sent a letter to Davis explaining that he was dismissing him as a patient due to Davis' lack of trust in his care. He asserted that trust between a clinician and a patient is essential for achieving the best outcomes, and he no longer believed there was a relationship of trust between them based on Davis' expressed dissatisfaction with his care. On April 23, 2025, Dr. Henrikson had his nurse call the institution with referrals to other providers with whom Davis could continue his care. Dkt. No. 90 at ¶¶29-32.

On May 2, 2025, the assistant health services manager and Dr. Murphy met with Davis to discuss his plan of care. They notified him that he would be scheduled with a new provider recommended by Dr. Henrikson. Dr. Murphy also extended Davis' tramadol prescription and informed him he could use his wheelchair around the unit since his crutches were causing him pain. On May 13, 2025, Davis filed an amended complaint asserting the claims addressed in this decision. Dkt. No. 94 at ¶¶96-98; Dkt. No. 15.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co*., 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

Davis first asserts that Dr. Murphy violated the Eighth Amendment when he misdiagnosed his ankle injury, delayed pursuing additional diagnostic testing and scheduling the recommended surgery, and failed to adequately address his complaints of pain. He also asserts that Pelky violated the Eighth Amendment when she ignored his complaints about the care he was receiving. Finally, Davis asserts that Dr. Henrikson violated the Eighth Amendment when he delayed scheduling and ultimately cancelled a surgery to address his ankle injury.

"Prison officials must provide inmates with medical care that is adequate in light of the severity of the condition and professional norms. The receipt of some medical care does not automatically defeat a claim of deliberate indifference. Deliberate indifference may occur where a prison official, having knowledge of a significant risk to inmate health or safety, administers blatantly inappropriate medical treatment, acts in a manner contrary to the recommendation of specialists, or delays a prisoner's treatment for non-medical reasons, thereby exacerbating his pain and suffering." *Perez v. Fenoglio*, 792 F.3d 768, 777 (7th Cir. 2015) (cleaned up).

No jury could reasonably conclude that Dr. Murphy was deliberately indifferent to Davis' ankle injury. The Court understands Davis' frustration at the initial misdiagnosis of his injury, but Davis has presented no evidence from which a jury could reasonably conclude that, before seeing the MRI results, Dr. Murphy knew—or even suspected—that Davis' ankle was fractured and not sprained. To the contrary, Dr. Murphy explains that, based on his experience and training, he concluded that Davis was suffering from a chronic ankle sprain because the x-ray showed no fractures, his Achilles and ligaments seemed intact, and Davis' reported symptoms were consistent with a sprain. Dr. Murphy's conclusion that Davis' ankle was merely sprained was ultimately revealed to be incorrect, but a mistaken belief about proper medical treatment does not equate to

deliberate indifference. *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016) ("[W]ithout more, a mistake in professional judgment cannot be deliberate indifference."); *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996) ("[A] defendant's inadvertent error, negligence or even ordinary malpractice is insufficient to rise to the level of an Eighth Amendment constitutional violation.").

Nor could a jury reasonably conclude that Dr. Murphy was deliberately indifferent when he waited four months before ordering an MRI and orthopedic consult. "[A]n inexplicable delay in treatment" can support an inference of deliberate indifference. *Petties v. Carter*, 836 F.3d 722, 730 (7th Cir. 2016). But this delay was not "inexplicable"; this delay was based on Dr. Murphy's mistaken belief that Davis had sprained his ankle. Dr. Murphy explains that it can take up to six months for a severe ankle sprain to fully heal, so immediately pursuing additional diagnostic testing was not medically indicated. He also notes that Davis' ankle showed some improvement with the passage of time, including decreased swelling and increased range of motion, which—in Dr. Murphy's opinion—confirmed the injury was a sprain. Nevertheless, based on Davis' reports that his ankle continued to hurt and his request for further testing, Dr. Murphy ordered an MRI and orthopedic consult. Davis highlights that the MRI was not scheduled for an additional four months and did not occur until three months after that, but Dr. Murphy is not responsible for scheduling and he had no control over the availability of appointments. *See Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Public officials do not have a free-floating obligation to put things to rights, disregarding rules . . . along the way. Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job. The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under § 1983 for not being

ombudsmen.”). Davis’ assertion that Dr. Murphy delayed scheduling the surgery is also without merit as the evidence shows that he ordered the surgery be scheduled the day after Dr. Henrikson recommended it. Although a scheduler did not schedule the surgery until about a month later, Dr. Murphy was not responsible for that delay. Indeed, the evidence shows that he followed up with the scheduler to inquire whether an earlier date was available.

Finally, no jury could reasonably conclude that Dr. Murphy was deliberately indifferent to Davis’ pain and discomfort. “[T[he Eighth Amendment does not entitle incarcerated patients to their preferred pain medication, nor does it impose the unrealistic requirement that doctors keep patients completely pain-free.” *Arce v. Wexford Health Sources, Inc.*, 75 F.4th 673, 681 (7th Cir. 2023) (citations omitted). Medical officials who know a prisoner is suffering must take “reasonable measures” to alleviate his pain. *Id.* The record demonstrates that Dr. Murphy did just that. In response to Davis’ complaints, Dr. Murphy prescribed numerous pain medications, physical therapy, and comfort items; he also ordered a wheelchair, gloves, crutches, and a walking boot. His evolving response to Davis’ complaints about pain and discomfort does not support an inference of deliberate indifference.

Next, no jury could reasonably conclude that Pelky was deliberately indifferent to Davis’ condition. Pelky explains that her role as health services manager is primarily administrative in nature. She asserts that she does not supervise doctors and has no authority to override their treatment decisions. Pelky’s involvement in Davis’ care was therefore extremely limited. When nurses forwarded her Davis’ health service request, she checked his medical records to confirm he was receiving treatment and was not being ignored. She then informed Davis that he had an upcoming appointment with his provider, that surgery had been scheduled, and that he was on the

waitlist for physical therapy. The Constitution does not require more. *See Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008).

Dr. Henrikson is also entitled to summary judgment on Davis' claim. First, Dr. Henrikson is not a state actor such that he can be sued under §1983. "When the State outsources to a private healthcare provider its constitutional obligation to provide prisoners with healthcare, a plaintiff suing under § 1983 must show that the provider acted under color of state law." *Thomas v. Mohiuddin*, No. 25-2352, 2026 WL 1859320, at *3 (7th Cir. June 29, 2026) (citing 42 U.S.C. §1983). This requires "such a 'close nexus between the State and the challenged action' that the challenged action 'may be fairly treated as that of the State itself.'" *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 823 (7th Cir. 2009) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)); *see also West v. Atkins*, 487 U.S. 42, 55 (1988). A business that contracts with the Department of Corrections to provide medical care to prisoners undertakes "freely, and for consideration, responsibility for a specific portion of the state's overall [constitutional] obligation to provide medical care for incarcerated persons," *Rodriguez*, 577 F.3d at 827, "and thus acts under color of state law for purposes of § 1983." *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 797 (7th Cir. 2014). However, medical providers who have "only an incidental or transitory relationship with the penal system generally are not considered state actors." *Id.* at 797-98.

Here, Dr. Henrikson received no payment from the State of Wisconsin or the Department of Corrections and has no contractual relationship with them by which he is required to provide treatment to prisoners. He is a co-owner of a privately owned medical facility who provides care to individual patients. Dr. Henrikson explains that he provided care to Davis just as he would have to any other patient who made an appointment at his clinic. He examined Davis at his office and not at the prison, and he made a recommendation without any interference, coercion, or guidance

from Davis' prison providers. Davis' prison providers retained the sole authority to approve the recommendation, and Davis was twice asked to provide consent to receive medical care from Dr. Henrikson at his clinic. Dkt. No. 90 at ¶¶6-17; Dkt. No. 92 at ¶¶5, 7.

Based on these considerations, the Court concludes that Dr. Henrikson was not a state actor. He had only an incidental and transitory relationship with the Department of Corrections. Dr. Henrikson had a direct relationship with Davis without regard to his incarcerated status. Dr. Henrikson offered treatment to Davis just as he would have to any other patient who made an appointment at his clinic, and the decision of whether to pursue the recommended treatment was left to the Department of Corrections and Davis. Because Dr. Henrikson did not have a sufficiently direct relationship with the State to find that he was acting under color of state law, he cannot be sued under §1983. *See Shields*, 746 F.3d at 797-98.

Moreover, even if Dr. Henrikson were a state actor, no jury could reasonably conclude that he was deliberately indifferent to Davis' condition. Davis highlights two circumstances which he asserts demonstrate deliberate indifference: 1) Dr. Henrikson's failure to check a box on a form indicating that the surgery should be promptly scheduled; and 2) Dr. Henrikson cancelling the surgery after Davis sued him. With regard to the first circumstance, Dr. Murphy explains that Dr. Henrikson's failure to check a particular box regarding timing had no impact on the scheduling of the surgery because, based on Dr. Henrikson's written recommendation, the scheduler was able to determine the urgency of the recommended surgery. Moreover, Dr. Henrikson confirms that the scheduler correctly understood the recommended surgery to be non-urgent, meaning Davis suffered no harm from Dr. Henrikson leaving the boxes on the recommendation form blank. *See Gabb v. Wexford Health Sources, Inc.,* 945 F.3d 1027, 1032 (7th Cir. 2019) ("In order to succeed

in a § 1983 suit, a plaintiff must establish not only that a state actor violated his constitutional rights, but also that the violation *caused* the plaintiff injury or damages.").

With regard to the second circumstance, the Eighth Amendment does not compel a surgeon from a privately-owned clinic to operate on a patient who has demonstrated his willingness to file a lawsuit because he does not get treated on his preferred timetable. Dr. Henrikson explains that the elective surgery was scheduled at the earliest time that there was an operating room available and that worked for him, his staff, and the hospital staff. When Dr. Murphy asked the scheduler to inquire whether the surgery could be scheduled sooner, she was told that the surgery could not be moved up. The Court understands Davis' desire to have the surgery sooner, but he was repeatedly informed that the surgery was scheduled and that he had to be patient. Davis was not patient; instead, he filed a lawsuit just weeks before the scheduled surgery. Dr. Henrikson reasonably opted to not proceed with the surgery under the circumstances, but instead to provide the Department of Corrections with recommendations of other surgeons. Put plainly, Davis' impatience, not Dr. Henrikson's deliberate indifference, is why the surgery was cancelled. Dr. Henrikson is therefore entitled to summary judgment.

Because the Court has resolved Davis' federal claims, it will relinquish jurisdiction over his state law claims. Subject to any restraints under state law, Davis may pursue those claims in the appropriate state court. *See* 28 U.S.C. § 1367(c)(3).

Finally, the Court will deny Davis' motion to authenticate and his motion for reconsideration of the Court's decision denying his motion to file a sur-reply. The State Defendants' response to Davis' motion demonstrates that his concerns about the record at issue are meritless. Moreover, as the Court explained in its August 26, 2026, decision, Davis did not comply with Civil L. R. 7(i), which requires that a party seeking leave to file a document not

contemplated by the rules to include the proposed document as an attachment. Davis never filed a proposed sur-reply.

**IT IS THEREFORE ORDERED** that Defendants' motions for summary judgment (Dkt. Nos. 67, 71) are **GRANTED** and this case is **DISMISSED**. Davis' state law claims are **DISMISSED without prejudice**. The Clerk of Court is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Davis' motion to authenticate is **DENIED** (Dkt. No. 109) and his motion for reconsideration (Dkt. No. 109) is **DENIED** for the reasons explained in the Court's August 26, 2026 decision.

Dated at Green Bay, Wisconsin this 27th day of October, 2026.

William C. Griesbach
United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine what, if any, further action is appropriate in a case.